IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| MARY A. JONES,<br>*On behalf of N.S.B., a minor,* | )<br>)<br>) |
|       Plaintiff, | )<br>) |
|       v. | )<br>) |
| COMMISSIONER OF SOCIAL SECURITY, | )<br>) |
|       Defendant. | ) |

Case No. 3:07-cv-513 WDS

## REPORT AND RECOMMENDATION

This matter has been referred to United States Magistrate Judge Donald G. Wilkerson by

United States District Judge William D. Stiehl pursuant to 28 U.S.C. § 636(b)(1)(B), Federal

Rule of Civil Procedure 72(b), and Local Rule 72.1(a) for a Report and Recommendation on the

Petition for Review of the Commissioner's Decision Denying Benefits filed on July 13, 2007, by

Mary A. Jones, on behalf of her minor daughter, N.S.B., ("Claimant") (Doc. 1).  For the reasons

set forth below, it is **RECOMMENDED** that Claimant's petition be **DENIED**, that judgment be

entered in favor of the Commissioner, and that the Court adopt the following findings of fact and

conclusions of law:

### FINDINGS OF FACT

*Procedural History*

Claimant applied for Supplemental Security Income benefits on September 10, 2004,

when she was ten years old (Tr. 122-23),[1] claiming the application date as the disability onset

---

[1]The transcript indicates Claimant filed applications for benefits on five previous
occasions: August 2, 1999 (Tr. 103-05); January 31, 2001 (Tr. 107-10); August 16, 2001 (Tr.
111-12); August 7, 2002 (Tr. 115-18); and July 30, 2003 (Tr. 120-21).  All were denied.

date.[2]  Claimant's request for benefits was denied initially on December 10, 2004 (Tr. 82-85), and

upon reconsideration on February 8, 2005 (Tr. 88-92).  Claimant requested a hearing before an

Administrative Law Judge ("ALJ") on the denials (Tr. 93-94).  Claimant appeared, represented

by counsel, at the hearing on October 13, 2006 (Tr. 715-65).  In a written opinion filed on

November 22, 2006, the ALJ denied the application (Tr. 12-27).  The Appeals Council denied

Plaintiff's request for review on May 11, 2007 (Tr. 8-10).  Thus, the ALJ's denial of benefits

became the final decision of the Commissioner. See 20 C.F.R. § 416.1481; Murphy v. Astrue,

496 F.3d 630, 633 (7th Cir. 2007).  Plaintiff now seeks judicial review of the Agency's final

decision pursuant to 42 U.S.C. § 405(g).

***Relevant Medical History***

On March 3, 2001, Claimant was evaluated by Dr. Gregory C. Rudolph, Licensed

Clinical Psychologist, for the State of Illinois Bureau of Disability Determination Services.  Dr.

Rudolph tested Plaintiff using the Wechsler Intelligence Scale for Children-III ("WISC-III").

Claimant had a Verbal IQ of 104, a Performance IQ of 83, and a Full-Scale IQ of 93, which put

her in the "average range of mental ability."  Dr. Rudolph opined that Claimant's "Verbal IQ of

104 is probably more indicative of her cognitive capability."  Dr. Rudolph diagnosed Plaintiff

with language articulation disorder, a learning disability, and mild conduct disturbance.  He noted

that Claimant displays some language articulation problems, and mild conduct disturbance, but is

able to take care of herself and her personal needs.  He reported that "the discrepancy between

Verbal and Performance IQ scores would reflect a learning disability."  (Tr. 478-80.)

In March 4, 2001, claimant was evaluated by Dr. Stanley Rabinowitz, M.D., for the State

_____

[2]The onset date was amended at the October 13, 2006, hearing (Tr. 127).

of Illinois Disability Determination Services.  Dr. Rabinowitz noted that Claimant fractured her

femur in 1999 when she was struck by a motorcycle.  Dr. Rabinowitz reported that Claimant has

difficulty walking long distances, standing for long periods of time, or climbing steps

repetitively, but she could perform the usual activities of daily living.  The physical examination

was normal, except for some persistent leg pain (Tr. 481-83).

On October 5, 2001, Claimant was evaluated by Dr. Jones of the Comprehensive Mental

Health Center of St. Clair County.  Claimant reported that she fights with other children in her

classroom.  Dr. Jones reported her grades to be good and noted that she had never been held back

in school.  Dr. Jones reported that Claimant has difficulty sitting still and difficulty concentrating.

Claimant's mother reported that Claimant is "hyper."  Dr. Jones noted Claimant's 1999 accident.

Dr. Jones reported that Claimant's stream of thought and talk were clear and logical, her mood

appropriate, that she was alert and oriented, and that her insight and judgment were age

appropriate.  Dr. Jones diagnosed Claimant with Attention Deficit Hyperactivity Disorder

("ADHD"), Traumatic Brain Injury, and a Global Assessment of Functioning ("GAF") of 50 (Tr.

554-55).[3]

On January 8, 2002, Dr. Birdean Williams, a psychologist, evaluated Claimant for the

State of Illinois Bureau of Disability Determination Services.  Dr. Williams found that Claimant

was adequately oriented to person, time, and place; her conversation was relevant; and her

thought processes logical and organized.  Dr. Williams noted that Claimant's expressive and

_____

[3]A GAF of 50 represents "serious symptoms (e.g., suicidal ideation, severe obsessional
rituals, frequent shoplifting) or any serious impairment in social, occupational, or school
functioning (e.g., no friends, unable to keep a job)." Diagnostic and Statistical Manual of Mental
Disorders, Text Revision 34 (4th ed. 2000).

receptive language skills were adequate for her age.  She reported some age-related

comprehension problems, and limited judgment.  Claimant appeared anxious and withdrawn, but

was cooperative and remained in her seat during the evaluation.  Dr. Williams reported that

Claimant appeared depressed, failing to smile or show emotions.  Claimant reported that she

experiences visual hallucinations, and her mother reported that she experiences auditory

hallucinations.  Claimant reported that she fights with her peers.  Dr. Williams indicated that

Claimant's impairments "seem to interfere with her capacity to meet the ordinary demands of

life," and opined that Claimant had Posttraumatic Stress Disorder (Tr. 556-59).

A report dated October 4, 2002, indicates that Dr. Jones at the Comprehensive Mental

Health Center of St. Clair County evaluated Claimant again and diagnosed her with ADHD,

Traumatic Brain Injury, and a GAF of 50.  Dr. Jones prescribed Concerta (Tr. 568-69).[4]

A report from the Comprehensive Mental Health Center dated December 23, 2002, listed

Claimant's diagnosis as ADHD and Bipolar Disorder.  It was noted that she was prescribed

Concerta and Geodon (Tr. 470-71).[5]

On March 14, 2003, Nurse Practitioner Bonnie Summers of the Southern Illinois

Healthcare Foundation referred Claimant to Dr. Yanamadala at the Gateway Regional Medical

Center (Tr. 589-90).  Dr. Yanamadala evaluated Claimant on July 24, 2003.  He reported that

Claimant was alert and oriented but exhibited a flat affect.  Her speech was of "increased latency,

decreased volume, and decreased tone."  Her mood was "okay" and her thought processes were

---

[4]Concerta is a central nervous system stimulant indicated for the treatment of Attention
Deficit Hyperactivity Disorder. Physicians' Desk Reference 1881-82 (61st ed. 2007).

[5]Geodon is indicated for the treatment of schizophrenia. Physicians' Desk Reference
2529-35 (61st ed. 2007).

goal directed.  Claimant denied current auditory or visual hallucinations.  Dr. Yanamadala

reported poor insight and judgment "by history."  He diagnosed Claimant with Oppositional

Defiant Disorder ("ODD"), ADHD, and reported a GAF of 35, with a highest GAF in the last

year of 45.[6]  Claimant was admitted into outpatient treatment for medication evaluation and

individual and group therapy (Tr. 603-04).

The transcript contains Dr. Yanamadala's treatment notes, which are difficult to read.

The Court was, however, able to glean the following.  On August 13, 2003, Dr. Yanamadala saw

Claimant and noted that her medications included Concerta and Lexapro.[7]  He reported no

suicidal ideation, no hallucinations, no difficulty sleeping or eating, and no adverse effects from

her medications.  He noted that Claimant was to start school on August 19 in the fourth grade (Tr.

651).

On September 3, 2003, Dr. Yanamadala reported that Claimant was "doing fine at

school," and that she "does well" on the medications, but that she was having "problems" at

night.  He prescribed Ritalin to be taken in the evening (Tr. 651).[8]  On October 2, 2003, Dr.

---

[6]A GAF of 35 indicates "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." Diagnostic and Statistical Manual of Mental Disorders, Text Revision 34 (4th ed. 2000).  A GAF of 45 represents "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Id.

[7]Lexapro is indicated for the treatment of major depressive disorder. Physicians' Desk Reference 1190-95 (61st ed. 2007).

[8]Ritalin is a mild central nervous system stimulant indicated for the treatment of Attention Deficit Disorders. Physicians' Desk Reference 2269-71 (61st ed. 2007).

Yanamadala wrote: "Grades are dropping"; "the school is hard"; and "she's doing good in the afternoon." He increased Claimant's dosage of Concerta to 54 mg (Tr. 652). On October 30, 2003, Dr. Yanamadala noted "still in regular classes." He decreased the dosage of Concerta to 36 mg (Tr. 653). On November 11, 2003, Dr. Yanamadala reported that Claimant was "doing well." He noted that Claimant had earned a "B" grade in social studies (Tr. 654). On December 31, 2003, Dr. Yanamadala reported that Claimant's appetite was "good," and her mood "happy" (Tr. 653).

On March 16, 2004, Dr. Yanamadala reported that claimant was doing well at home and school and that her mood was good. He recorded her grades as "A" in language and math, "B" in science and reading, and "C" in social studies (Tr. 654). On June 30, 2004, Claimant complained of headaches. Dr. Yanamadala referred her to Dr. Ali, a neurologist. Dr. Yanamadala noted, "she does well one on one" (Tr. 656). On July 30, 2004, Claimant complained of continued headaches and stated that she "hear[s] people calling my name." Dr. Yanamadala noted school starts on August 23 and that Claimant would be in the fifth grade. He increased her dosage of Lexapro to 10 mg. (Tr. 656).

On September 8, 2004, Dr. Yanamadala noted that Claimant had "got into it with a student" in the second week of school (Tr. 657). He wrote a prescription addressed "to whom it may concern" which stated: "It is recommended patient be placed in a behavioral program." (Tr. 658). On October 7, 2004, Dr. Yanamadala noted that Claimant was "doing bad" and was getting out of her seat without permission. He increased her dosage of Concerta to 54 mg. (Tr. 657). On November 4, 2004, Dr. Yanamadala reported that Claimant was having difficulty academically, recording a grade of "D" in Reading and Math, and "C" in Language, Spelling,

Social Studies, and Science (Tr. 659).

On November 11, 2004, Claimant was evaluated for state disability by Gregory C. Rudolph, Ph.D., who diagnosed her with Major Depression with Psychosis and Auditory Hallucinations, without suicidal ideation, and ADHD. Dr. Gregory reported that Claimant had some conduct disturbances in the school setting, but that she was able to take care of herself and her personal needs. She was oriented to reality and her memory was appropriate. She had an adequate knowledge of general information, was able to perform simple arithmetic calculations, and was able to use simple judgment and reasoning. Her mood level reflected "an overall tone of depression." Dr. Gregory reported that her medications at the time of evaluation were Lexapro, Concerta, and Methyphenadate (Ritalin) (Tr. 635-38).

Claimant saw Dr. Yanamadala again on December 1, 2004 (Tr. 659). On that date, he wrote a letter to Claimant's school which stated, "It is recommended that patient be placed in special education to assist her with her academics" (Tr. 660). On December 29, 2004, Dr. Yanamadala wrote "auditory hallucinations" in Claimant's chart. He added Geodon to her medications (Tr. 661).

On March 23, 2005, Dr. Yanamadala noted that Claimant was in special education classes and that she was "doing pretty good" (Tr. 682). On May 18, 2005, Dr. Yanamadala noted that Claimant had been "cutting up since new principal" and "fighting with female peers" (Tr. 682).

On May 20, 2005, Claimant saw Nurse Practitioner Bonnie Summers at the Southern Illinois Healthcare Foundation who reported that Claimant was in "special ed behavior" and was obese (Tr. 690).

On July 27, 2005, Claimant saw Dr. Yanamadala again. He reported that Claimant had

conflicts with her brother.  He added Celexa to her medications (Tr. 683).[9]  On September 21,

2005, Dr. Yanamadala noted that Claimant was in "special ed" and that her grades were "B" in

Grammar, Social Studies, and Literature; "C-" in Math, and "D" in Science.  He also noted that

she was participating in a "group" (Tr. 683).  On November 16, 2005, Dr. Yanamadala reported

that Claimant was disrupting class with oppositional, defiant, and argumentative behavior (Tr.

684).  A note in the chart dated the same day reads: "Mother called to see if she should have

school put her in special classes.  Per Dr. she does not need special classes" (Tr. 684).  On

December 14, 2005, Dr. Yanamadala reported that Claimant had been sent to in-school

suspension for arguing (Tr. 684).

On February 15, 2006, Dr. Yanamadala noted that Claimant was doing "all right" (Tr.

685).  On April 12, 2006, he reported that Claimant was "doing better" (Tr. 685).  On June 7,

2006, he noted that Claimant "passed into the 7th" grade (Tr. 686).  Dr. Yanamadala saw

Claimant again on August 1, 2006 (Tr. 686), and on September 25, 2006 (Tr. 687).  There are no

additional treatment notes from Dr. Yanamadala.  Included in the transcript, however, is a

prescription form, dated September 25, 2006, and signed by Dr. Yanamadala, which states:

> To whom ever it may concern:  Patient has extreme difficulty comprehending.
> Considering Patient's disability she needs to be in special education full time.

(Tr. 681A).

### School Evaluations

School Psychologist Kelly Boyd prepared a Psychiatric Report on Claimant based upon

observations and evaluations conducted on November 12, 2004, and January 25, 2005 (Tr. 411-

---

[9]Celexa is indicated for the treatment of depression. Physicians' Desk Reference 1176-81
(61st ed. 2007).

17).  Ms. Boyd evaluated Claimant using the WISC-IV, which indicated the following scores:

| | |
|---|---|
| Verbal Comprehension Index: | 75 |
| Perceptual Reasoning Index: | 90 |
| Working Memory Index: | 65 |
| Processing Speed Index: | 80 |
| Full Scale IQ: | 73 |

(Tr. 416).  Ms. Boyd reported that these scores placed Claimant's overall ability in the borderline range.  She noted:

> A significant discrepancy exists, however, between her Perceptual Reasoning skills and her Verbal Comprehension and Working Memory.  Her Full Scale IQ is not, therefore considered a valid representation of her overall ability.

(Tr. 412).  Ms. Boyd went on to report that Claimant's Perceptual Reasoning Index ("PRI") of 90 was in the average range and her Verbal Comprehension Index ("VCI") of 75 was in the borderline range (Tr. 412-13).

On February 11, 2005, the Claimant's school issued a "Multidisciplinary Conference Summary Report" (Tr. 669-81), which the school principal, school psychologist, Claimant's mother, Claimant, school social worker, a teacher, and the special education teacher signed and approved.  The 13-page report included detailed observations of Claimant's academic performance, social development, medical history, and psychological state.  Much of the psychological evaluation is based upon the Psychological Report prepared by Ms. Boyd.  The report also contains the results of intelligence testing and behavioral assessments.  The report concludes that:

> [Claimant] is a 10 year 8 month old girl who displays significantly better developed perceptual reasoning skills than verbal comprehension skills.  She has

difficulty understanding, retaining, and responding to information she hears. She
displays average ability to process and respond to information presented visually.
Working memory and visual motor integration are also areas of weakness.
[Claimant's] academic skills in Reading Comprehension, Pseudoword decoding,
Math calculation and Written Expression are all significantly below predicted
levels based on her nonverbal cognitive skills. [Claimant] has some emotional
issues including atypical behaviors such as seeing and hearing things that are not
there (per self-report). [Claimant's] mother reports significant behavioral and
emotional issues at home while her teacher's report of externalizing behavior is
not significant. [Claimant] currently takes medication for her "behavior."
Eligibility for special education services were discussed at a multidisciplinary
conference.

(Tr. 674-75). The report concluded that Claimant had a learning disability which required special

education in the form of "small group individualized instruction" (Tr. 680).

An Individualized Education Plan ("IEP") dated April 22, 2005, provided detailed

analysis of Claimant's progress over the 2004-05 school year. The report indicated that Claimant

was initially taking special education classes for 600 minutes per week. At the time of the

report, that amount was increased to 750 minutes per week, which totaled less than 50% of

Claimant's time spent outside a regular classroom (Tr. 420-21). In the section entitled

"Placement Options Considered," a placement in "full-time spec. ed. class in reg. school

building" was marked as "rejected" because the "placement is too restrictive based on student's

needs" (Tr. 421).

In an April 2006 IEP, Claimant's time in special education was increased to 810 minutes

per week, which was less than 60% of her time outside a regular classroom. Placement in special

education for more than 60% of Claimant's school time was again rejected as "too restrictive

based on student's needs" (Tr. 428-29). Claimant's mother signed both of these IEP reports (Tr.

421, 429).

On September 29, 2006, Katherine Halford, Claimant's social studies teacher completed a

School Activities Questionnaire for Claimant's attorney.  Ms. Halford reported that she had

Claimant as a student for 1½ months at the time she replied to the form.  She reported that

Claimant was in seventh grade and that she attended a regular social studies class.  The form

asked whether Claimant had been suspended, disciplined, or expelled.  Ms. Halford replied:

> [Claimant] has earned after school detention a few times.  She occasionally must
>
> be sent to In School Suspension due to classroom disruption.  She hasn't been
>
> suspended or expelled that I am aware of.

(Tr. 438).  The remaining four pages of the form contain a list of abilities related to the six

domains outlined in the Federal Regulations for determining disability of a child.  For each

ability, the teacher was asked to check one of four boxes: no limitation, moderate limitation,

marked limitation, or extreme limitation.  Ms. Halford indicated Claimant had extreme

limitations in the following abilities: apply problem solving skills, express ideas in writing, carry

through and finish activities, change activities easily, work without needing task redirection,

work independently, maintain pace, carry out instructions, control impulses, avoid becoming

easily frustrated, ability not to be disruptive or talk out of turn, avoid temper outbursts, and work

independently.  Ms. Halford indicated Claimant had marked limitations in the following abilities:

discuss or apply previously learned material; reading comprehension; comprehend and follow

oral instructions; follow and understand classroom discussions; focus and maintain attention;

remain alert; avoid careless mistakes; avoid being fidgety, overactive or restless; complete

classroom assignments on time; complete homework assignments on time; get along with other

children; take turns; follow rules; ability not to act aggressive; avoid fighting with peers; obey

authority; honesty; consider others' feelings and points of view; cope with stress; cope with

change; and imitate healthy adult behavior. In all other areas Ms. Halford found Claimant to have no impairment or moderate impairment. The form included no areas for Ms. Halford to describe or elaborate upon the objective bases for her assessment (Tr. 438-42).

### The October 2006 Hearing

Claimant and Claimant's mother testified at the October 2006 hearing. Claimant was represented by counsel. Claimant's mother testified that her daughter was twelve years old at the time of the hearing (Tr. 720). She testified that Claimant lives with her and Claimant's two siblings, ages 18 and 6 (Tr. 720). Claimant attends middle school and is in the 7th grade (Tr. 721). She attends special education classes for Math, Reading, and English (Tr. 721). Claimant's mother testified that Dr. Yanamadala, recommended that Claimant attend special education classes full-time (Tr. 721). She testified that Claimant has been diagnosed with a learning disability, ADHD, and ODD (Tr. 722). She testified that claimant has difficulty doing her homework because she cannot read (Tr. 722). She testified that Claimant also has difficulty remembering and following directions on simple household tasks (Tr. 723). Claimant's mother testified that Claimant reports to her that she has difficulty getting along with peers in her classroom and that she does not have any friends (Tr. 724-25). She testified that Claimant does not have any problems with her physical health (Tr. 725-26). She testified that Claimant bathes herself, but cannot wash her own hair; she feeds and dresses herself; she washes dishes; she cannot cook anything, but can use the microwave; and she cannot do her own laundry (Tr. 730-31, 33). Claimant's mother testified that Claimant has a good appetite, sleeps well, and likes to watch television, but does not exercise (Tr. 737-38). Claimant's mother testified that Claimant sees Dr. Yanamadala every two months (Tr. 737). He prescribes Ritalin, Geodon, and Lexapro

(Tr. 741).

Claimant also testified at the hearing. She testified that she is in the seventh grade and likes school (Tr. 745). She takes classes in Social Studies, Reading, Math, English, and Science (Tr. 745). She testified that she is not involved in any sports or extracurricular activities (Tr. 746). She testified that she gets in arguments with other students in her classes, causing her to be punished with in-school suspension (Tr. 746-47, 49). She testified that she has no friends at school (Tr. 747). She testified that in her free time at home she likes to watch television and listen to music (Tr. 747-48). She testified that she cleans her room and makes her bed, but does not wash her own clothes (Tr. 750-52). She testified that she attends church regularly, but does not have any friends at church (Tr. 754). She testified that she sweeps and mops and helps carry groceries into the house (Tr. 757-58).

### The ALJ's Opinion

In his decision, the ALJ found that 1) Claimant had not engaged in substantial gainful activity at any time relevant to the decision; 2) Claimant had the severe impairments of oppositional defiant disorder, learning disorder, attention deficit hyperactivity disorder, and obesity; and 3) Claimant does not have an impairment or combination of impairments that meets or medically equals a listed impairment, nor did she have an impairment or combination of impairments that functionally equals a listed impairment (Tr. 18-20). Thus, the ALJ found that the Claimant was not disabled under the Act (Tr. 27). In finding that Claimant did not have an impairment medically or functionally equaling a listed impairment, the ALJ gave greater weight to school reports of Claimant's functioning than to the opinion of the treating physician's statement that Claimant "needs to be in special education full time" because that opinion was not

supported by "real objective evidence," was inconsistent with a prior determination that Claimant "did not need special classes," and was contradicted by school reports. Thus, the ALJ found the physician's opinion was "unsupported by the evidence as a whole." (Tr. 21.) The ALJ also afforded little weight to Ms. Halford's School Activities Questionnaire because Claimant had been in the teacher's class for only six weeks, the form was not a recognized medical source opinion, and it does not articulate an objective basis for the extreme limitations reported (Tr. 21). Under the six domains requiring analysis in the regulations, the ALJ found that Claimant had 1) less than a marked limitation in the domain of acquiring and using information, 2) less than a marked limitation in attending and completing tasks, 3) a marked limitation in interacting and relating to others, 4) no limitation in moving about and manipulating objects, 5) no limitation in the ability to care for herself, and 6) less than a marked limitation in health and physical well-being (Tr. 22-26).

### CONCLUSIONS OF LAW

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act ("Act") is limited to a determination of whether those findings are supported by substantial evidence. 42 U.S.C. § 405(g) ("the findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive"); White v. Barnhart, 415 F.3d 654, 659 (7th Cir. 2005) (quoting Jens v. Barnhart, 347 F.3d 209, 202 (7th Cir. 2003) (the reviewing court "is not allowed to substitute its judgment for the ALJ's by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility"). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion." Richardson v. Perales,

402 U.S. 389, 401 (1972) (quoting Consolidated Edison Company v. NLRB, 305 U.S. 197, 101

(1938)).  See also Sims v. Barnhart, 309 F.3d 424, 428 (7th Cir. 2002); Green v. Shalala, 51 F.3d

96, 101 (7th Cir. 1995).  An ALJ's decision must be affirmed if the findings are supported by

substantial evidence and if there have been no errors of law.  See Cannon v. Apfel, 213 F.3d 970,

974 (7th Cir. 2000).  However, "the decision cannot stand if it lacks evidentiary support or an

adequate discussion of the issues." Lopez ex. rel. Lopez v. Barnhart, 336 F.3d 535, 539 (7th Cir.

2003); Carradine v. Barnhart, 360 F.3d 751, 756 (7th Cir. 2004) (stating that "an administrative

agency's decision cannot be upheld when the reasoning process employed by the decision maker

exhibits deep logical flaws").

 A child under the age of eighteen is considered "disabled" under the Act if she "has a

medically determinable physical or mental impairment, which results in marked and severe

functional limitations, and which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months." 42 U.S.C. §

1382c(a)(3)(C)(i).  The ALJ follows a three-step process outlined in 20 C.F.R. § 416.924 in

making a disability determination. See also Murphy v. Astrue, 496 F.3d 630, 633 (7th Cir. 2007).

At the first step, the claim will be denied if the child is engaged in "substantial gainful activity."

See 20 C.F.R. § 416.924(a).  The claim will be denied at the second step if the child does not

have "medically severe impairments." See 20 C.F.R. § 416.924(c).  At the third step, the

claimant's impairments must meet or medically or functionally equal an impairment listed in the

regulations at 20 C.F.R. pt. 404, subpt. P, App. 1. See 20 C.F.R. § 416.924(d).

 To determine whether an impairment functionally equals a listed impairment, the ALJ

evaluates the severity of the impairment in six functional domains: 1) acquiring and using

information, 2) attending and completing tasks, 3) interacting and relating with others, 4) moving about and manipulating objects, 5) caring for self, and 6) health and physical well-being. See 20 C.F.R. § 416.926a(b)(1); Giles ex rel. Giles v. Astrue, 483 F.3d 483, 487 (7th Cir. 2007). To make a finding of disability, the ALJ must determine that the child has either an "extreme" limitation of functioning in one domain, or a "marked" limitation in two domains. See 20 C.F.R. § 416.926a(a).[10] The ALJ found that Claimant had a marked limitation of functioning in only one of the six domains. Thus, the ALJ determined that Claimant was not disabled.

Claimant argues that the ALJ erred in: 1) finding that Claimant's impairments did not equal the listed impairment of mental retardation, 2) affording little weight to the teacher questionnaire, and 3) discounting Claimant's treating physician's opinion that Claimant should be placed in special education classes full-time (Doc. 16).

### Listed Impairment of Mental Retardation

Claimant argues that the ALJ erred in finding, at the third step, that her impairment did not meet or equal the listed impairment for mental retardation. The listing for Mental Retardation states:

> The required level of severity for this disorder is met when the requirements in A, B, C, D, E, or F are satisfied.
> . . .
>
> D.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and

---

[10]The regulations define an extreme limitation as a limitation that interferes "very seriously with [the] ability to independently initiate, sustain, or complete activities." It is also defined as a limitation that is "more than marked." 20 C.F.R. § 416.926a(e)(3). The regulations define a marked limitation as a limitation that interferes "seriously with your ability to independently initiate, sustain, or complete activities." A marked limitation is one that is "more than moderate" but "less than extreme." 20 C.F.R. § 416.926a(e)(2).

significant limitation of function; OR

E.    A valid verbal, performance, or full scale IQ of 60 through 70 and:
    2.    For children (age 3 to attainment of age 18), resulting in at least
        one of paragraphs B2b or B2c or B2d of 112.02.[11]

20 C.F.R. Part 404, subpart P, App. 1 (part B) § 112.05. The regulations instruct the ALJ to use

the lowest of the three scores (verbal, performance, or full-scale) in evaluating an IQ score on the

Wechsler scale. See 20 C.F.R. Part 404, subpart P, App. 1 (part B) § 112.00(D)(9).

The ALJ found that Claimant's impairments did not meet or equal the listing for mental

retardation. The ALJ indicated Claimant's March 2001 full-scale IQ score of 93 (with verbal IQ

score of 104 and performance IQ score of 83) and her February 2005 full-scale IQ of 73 (Tr. 18-

19). The ALJ noted that the February 2005 full-scale score was considered by the testing

psychologist to be invalid.

Claimant argues that her WMI (Working Memory Index) Score of 65 on the February

2005 test meets the listed impairment. Although Claimant had a WMI score between 60 and 70,

her full-scale score was 73. Her verbal comprehension score was 75, her perceptual reasoning

index was 90, and her processing speed index was 80. Claimant argues that changes between the

WISC-III (which produces 3 indices--verbal, performance, and full-scale IQ--and upon which the

regulations are based) and the WISC-IV (which produces five indices--full-scale IQ, verbal

comprehension, perceptual reasoning, working memory, and processing speed) have left open the

question of which of the scaled scores an ALJ should use to make a finding regarding the listing

of mental retardation. Claimant contends that because there is not a clear indication which of the

---

[11]B2b, B2c, and B2d of 112.02 require marked impairment in age-appropriate social
functioning, age-appropriate personal functioning, or marked difficulties in maintaining
concentration, persistence, or pace.

scores is to be used, the ALJ should have consulted a medical expert on the question.

The Commissioner argues (Doc. 19) that despite the changes between the WISC-III and the WISC-IV, the regulations still contemplate use of only the full-scale, verbal (now called Verbal Comprehension Index), and performance (now called Perceptual Reasoning Index) scores in comparing a claimant's impairments to the listing for mental retardation. Specifically, the Commissioner points to a WISC Technical Report that indicates that the changes from verbal IQ to Verbal Comprehension Index and from performance IQ to Perceptual Reasoning Index were nominal, and that the newly-dubbed VCI and PRI "should be substituted for the VIQ and the PIQ when making clinical decisions and in other situations where VIQ and PIQ were previously required" (Tr. 700).

The Court finds that substantial evidence exists to support the ALJ's finding that Claimant's impairments do not meet the listing for mental retardation. The ALJ discussed Claimant's mental impairments at length. He noted the 2005 full-scale IQ of 73, but then noted the evaluating school psychologist opined that the 2005 scores were invalid. The ALJ went on to discuss the additional findings made by the school psychologist in the 2005 report did not support a finding that the Claimant met the listing for mental retardation. The ALJ also reported the Claimant's 2001 WISC scores (full-scale of 93, verbal of 104, and performance of 83), which represented the average range of intellectual functioning. Although the regulations state that an IQ score is valid for only 2 years for a child between the ages of 7 and sixteen who scores above 40, see 20 C.F.R. Part 404, subpart P, App. 1 (part B) § 112.00(D)(10), the 2001 scores still provide support for a finding that Claimant functions within the average range. The ALJ also noted Claimant's history of "age-appropriate expressive and receptive language skills."

The Court notes that the Claimant's 2005 scores for verbal, performance, and full-scale IQ are all above the listed range for mental retardation, even though her working memory score was only 65. The Court also finds it significant that no evaluating or treating physician nor any educator or mental health professional expressing an opinion found the Claimant to be mentally retarded. Based upon the explanation of the ALJ and the evidence submitted to the Court in the transcript, the Court finds that the ALJ's opinion that the Claimant does not meet the listing for mental retardation is supported by substantial evidence on the record as a whole.

***Teacher Questionnaire***

Claimant argues that the ALJ erred in affording little weight to Ms. Halford's report that Claimant had multiple extreme and marked limitations in acquiring and using information, attending and completing tasks, interacting and relating with others, and in caring for herself. The Claimant argues that the ALJ improperly evaluated the questionnaire as a medical source opinion, that the time Claimant had been in that classroom was significant, and that the ALJ did not properly explain why the IEP should be given greater weight.

The ALJ indicated that he gave little weight to the questionnaire, because it was "the product of a pre-printed form questionnaire from the claimant's attorney," Claimant had been Ms. Halford's student for only six weeks, and the opinions expressed do not constitute a "medical source opinion" under the regulations. Furthermore, the ALJ indicated that the teacher did not articulate any objective bases for the reported limitations, the report was inconsistent with the school IEP reports, and was not supported by other objective evidence in the record. (Tr. 21)

The Court finds that substantial evidence in the record supports a finding of granting little weight to this teacher's opinion. First, the Court disagrees that the ALJ was attempting to

evaluate the teacher's report as a medical source opinion. He was merely noting that such a form is not a medical source opinion. Second, the Court finds it significant that the questionnaire contains only checked boxes without any additional explanation of how or upon what basis the Claimant is limited in the areas noted on the form. By contrast, the IEP reports from the school contain specific, detailed observations of Claimant's behavior and include findings and scores from a number of standardized tests. The Court also agrees that the observation time of this teacher in September 2006, only six weeks into the nine-month school year, was limited. This evidence is sufficient to support the determination to give limited weight to the teacher questionnaire. Thus, the Court finds that the ALJ's conclusion on this question is supported by substantial evidence on the record as a whole.

***Treating Physician's Report***

Claimant argues that the ALJ erred in giving little weight to Dr. Yanamadala's opinion that Claimant "needs to be in special education full time."

The ALJ states that he gave greater weight to the school IEP reports "pertaining to the claimant's school functioning, than to the treating physician." The ALJ states that the opinion regarding special education full time is entitled to minimal deference because it is not supported by "real objective evidence" and is inconsistent with Dr. Yanamadala's own prior assessment that Claimant "does not need special classes." The ALJ further notes that the opinion is not supported by the physicians own medical treatment records, is inconsistent with school IEP reports, and is unsupported by the evidence as a whole. (Tr. 21)

An ALJ cannot substitute his own judgment for that of a physician without relying on other medical opinions or authority on the record. Clifford v. Apfel, 227 F.3d 863, 870 (7th Cir.

2000) (quoting <u>Rohan v. Chater</u>, 98 F.3d 966, 968 (7th Cir. 1996)).  The ALJ must also accord

the appropriate weight to medical opinions.  <u>See</u> 20 C.F.R. § 404.1527(d)(2).  For example, a

treating physician's opinion is afforded more weight because they are more familiar with the

patient's conditions and circumstances. <u>Clifford</u>, 227 F.3d at 870;  20 C.F.R. §

404.1527(d)(2).  That physician's opinion is afforded controlling weight if it is "if it is well

supported by medical findings and not inconsistent with other substantial evidence in the record.

<u>Id.</u>; <u>Gudgel v. Barnhart</u>, 345 F.3d 467, 470 (7th Cir. 2003) ("[a] treating physician's opinion

regarding the nature and severity of a medical condition is entitled to controlling weight if it is

well supported by medical findings and not inconsistent with other substantial evidence in the

record.").  A treating physician's opinion will be given controlling weight where it is "well-

supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with the other substantial evidence in your case record." 20 C.F.R. §416.927(d)(2).

It does not appear that the ALJ discounted all of the treating physician's opinions, only

his statement that the Claimant needs to be in special education full-time.  It is significant that the

treating physician was not expressing a medical opinion, but making an educational

recommendation.  Dr. Yanamadala's treatment notes that Claimant was doing "bad" or "good" at

a certain time are by Claimant's and Claimant's mother's self-reporting; they are not medical

findings.  The IEP reports issued by the school district provide detailed information regarding the

Claimant's behavior, mental condition, abilities, and academic progress within the school

context.  Further, the IEP reports consider a number of standardized tests in making the

determination regarding the Claimant's need for and access to special education services.  Finally

the ALJ correctly pointed out the internal inconsistency between Dr. Yanamadala's November

2005 opinion that Claimant "does not need special classes" and his September 2006 statement that she needs special education "full-time." Because the IEP reports contain so much objective information, the Court cannot take issue with the ALJ's rejection of one unsupported statement by a physician about the Claimant's educational needs in favor of a well-supported, objective report from the school. Therefore, the Court finds that substantial evidence supports the ALJ's rejection of the treating physician's opinion in favor of the school's assessment of the Claimant's educational needs.

### CONCLUSION

Based on all the foregoing, the Court finds that Claimant has failed to demonstrate that the ALJ's decision was not supported by substantial evidence or that he committed an error of law. It is therefore **RECOMMENDED** that Claimant's petition be **DENIED**, that judgment be entered in favor of the Commissioner, and that the Court adopt the foregoing findings of fact and conclusions of law.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 73.1(b), the parties shall have ten (10) days after service of this Recommendation to file written objections thereto. The failure to file a timely objection may result in the waiver of the right to challenge this Recommendation before either the District Court or the Court of Appeals. Snyder v. Nolen, 380 F.3d 279, 284 (7th Cir. 2004); United States v. Hernandez-Rivas, 348 F.3d 595, 598 (7th Cir. 2003).

**IT IS SO ORDERED.**

**DATED: September 2, 2008**

s/ Donald G. Wilkerson
**DONALD G. WILKERSON**
**United States Magistrate Judge**